United States Court of Appeals
FOR THE EIGHTH CIRCUIT
No. 96-1479

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Paul David Logan, Also Known | * | |
| as Bear, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  November 21, 1996

Filed:  August 4, 1997
_____

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    BOGUE,[1] District Judge.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Paul Logan and nine others were indicted for conspiracy to distribute, and to possess with the intent to distribute, more than one kilogram each of heroin and methamphetamine.  See 21 U.S.C. § 841(a)(1), § 846.  The conspiracy was alleged to have existed between December, 1992, and June, 1995.  After a seven-day trial, a jury

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

convicted Mr. Logan and four co-defendants whose cases we do not address in this opinion (a fifth co-defendant whose case we do not address in this opinion was convicted after a separate two-day trial). See also United States v. Rodriguez, 112 F.3d 374 (8th Cir. 1997), and United States v. Bryson, 110 F.3d 575 (8th Cir. 1997).

The trial court sentenced Mr. Logan to 210 months in prison and a $1,700 fine. Mr. Logan appeals both his conviction and his sentence. We affirm Mr. Logan's conviction but remand his case for resentencing.

I.

One of the government's witnesses against Mr. Logan was Cindy Carlen, whose sister was formerly married to Mr. Logan. During her testimony, Ms. Carlen testified about an interview that she had with a state police officer in 1993 while she was in a county jail in Illinois. She acknowledged that in return for that interview, she was supposed to be released from jail 22 days early. Ms. Carlen testified, however, that she did not remember anything that she said to the officer. She added that she had "been under a lot of medication lately" and "forg[o]t a lot of things," that she was a regular user of methamphetamine at the time of the interview, and that she was on medication at the time of the interview. Ms. Carlen also said that after she was released from jail, she contacted the police to say that she "wanted to retract any statements" that she had made while in jail. She did so, she conceded, "probably" because she was afraid that in her "attempt to get out of jail," she "had stated something during those interviews that [was not] true."

The government then called as a witness the state police officer who interviewed Ms. Carlen in 1993. He testified that in the course of his three-hour interview with Ms. Carlen, she made various statements to him that were incriminating to Mr. Logan. At the government's prompting, the officer repeated those statements (there was no written document with Ms. Carlen's statements as acknowledged by her; the only

-2-

document available was the officer's own notes about his interview with Ms. Carlen). Mr. Logan challenges the introduction of the officer's testimony about the content of Ms. Carlen's oral statements. Mr. Logan argues that because Ms. Carlen said that she could not remember what she said in the interview, the introduction of the officer's testimony about Ms. Carlen's alleged statements violated Mr. Logan's rights under the confrontation clause of the sixth amendment. See, e.g., United States v. Owens, 484 U.S. 554, 557-58 (1988).

Initially, we note that although Mr. Logan makes a confrontation clause argument on appeal, his objection during trial was based only on the rules of evidence dealing with hearsay. See Fed. R. Ev. 801(c). We therefore decline to consider the constitutional argument that Mr. Logan makes. We do, however, consider under the plain error rule, see Fed. R. Crim. P. 52(b), the hearsay difficulties inherent in the state police officer's testimony, because "[i]t is fundamental to our system of justice 'that [defendants] should not be allowed to be convicted on the basis of unsworn testimony.' " United States v. Love, 592 F.2d 1022, 1026 n.9 (8th Cir. 1979), quoting United States v. Morlang, 531 F.2d 183, 190 (4th Cir. 1975).

II.

The government contended at trial that the testimony of the state police officer about Ms. Carlen's statements to him was admissible not as substantive evidence under some exception to the hearsay rules, see Fed. R. Ev. 801(d)(1), 803(24), 804(b)(5), see also Fed. R. Ev. 804(a)(3), but instead to impeach Ms. Carlen's credibility as a witness, see Fed. R. Ev. 607. In other words, the government asserted, the testimony about the content of Ms. Carlen's statements was offered not "to prove the truth" of those statements, see Fed. R. Ev. 801(c), but, rather, to show that Ms. Carlen had earlier made statements that were inconsistent with her testimony at trial, see Fed. R. Ev. 613(b), and therefore that she was not a believable witness.

A serious difficulty with the government's position and with the introduction in general by the government of prior inconsistent statements for the purpose of impeaching a government witness is "the fact that the power to impeach one's own witness can be abused." See 27 C. Wright and V. Gold, Federal Practice and Procedure: Evidence § 6093 at 496 (1990). When the government calls the witness to be impeached in a criminal case "simply for the purpose of eliciting testimony inconsistent with a prior statement," the government's actual intent may be not "to attack credibility ... [but] to expose the jury to the prior inconsistent statement and ... improperly induce the jury to consider the statement for the truth of the matters asserted therein." See 28 C. Wright and V. Gold, Federal Practice and Procedure: Evidence § 6203 at 535 (1993). "Courts must be watchful that impeachment is not used as a subterfuge to place otherwise inadmissible hearsay before the jury." United States v. Rogers, 549 F.2d 490, 497 (8th Cir. 1976), cert. denied, 431 U.S. 918 (1977).

We believe, however, that the government's motive in eliciting testimony is irrelevant. Although some courts focus on determining the "true" purpose of the government in introducing testimony, we think that the relevant question is simply whether the evidence is admissible under Fed. R. Ev. 403. See, e.g., United States v. Ince, 21 F.3d 576, 580 (4th Cir. 1994); United States v. Webster, 734 F.2d 1191, 1193 (7th Cir. 1984); and United States v. DeLillo, 620 F.2d 939, 944, 946-47 (2d Cir. 1980), cert. denied, 449 U.S. 835 (1980). See also 27 Wright and Gold, Federal Practice § 6093 at 507-08, and 28 Wright and Gold, Federal Practice § 6206 at 535. In other words, we hold that the proper inquiry is whether, as an objective matter and irrespective of the government's motive, the probative value of a statement for impeaching the credibility of a witness is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," see Fed. R. Ev. 403. With this construct in mind, we turn to the relevant specifics of Ms. Carlen's testimony and the state police officer's recounting of Ms. Carlen's earlier, different statements to him.

In her testimony, Ms. Carlen denied ever receiving methamphetamine directly from Mr. Logan. In contrast, the state police officer testified that Ms. Carlen told him that she bought methamphetamine in one- or two-ounce quantities from Mr. Logan "for around two years." Ms. Carlen also denied that she had ever seen Mr. Logan "counting a large sum of money" -- approximately $20,000. The officer testified, however, that Ms. Carlen told him that she once saw Mr. Logan counting "what she would have guessed" to be $20,000 to $30,000 in cash and saying that he was sending the money to California. Ms. Carlen denied that she had ever met anyone named "Ronnie." According to the officer, however, Ms. Carlen told him that in 1992 or 1993 she met a man named "Ronnie" from California who was Mr. Logan's methamphetamine supplier and who came to Mr. Logan's house in Illinois, evidently to bring methamphetamine to Mr. Logan. Finally, Ms. Carlen denied that she told the officer that Mr. Logan told her about losing $25,000 because of a drug shipment that was intercepted by the police. The officer testified, in contrast, that Ms. Carlen told him that Mr. Logan once related that a drug shipment that was intercepted by the police would cost him $25,000.

Because the statements are inconsistent, their only value lies in their ability to "raise doubts regarding the truthfulness of <u>both</u> statements" (emphasis in original), <u>Firemen's Fund Insurance Co. v. Thien</u>, 8 F.3d 1307, 1311 (8th Cir. 1993), in other words, to suggest that Ms. Carlen is not a credible person. <u>See</u>, <u>e.g.</u>, 28 Wright and Gold, <u>Federal Practice</u> § 6206 at 534. The prior statements are inculpatory to Mr. Logan if considered to be true, however, so in order to be admissible, their value for impeachment purposes -- for portraying or exposing Ms. Carlen as a person who is unworthy of belief -- has to outweigh the danger of unfair prejudice and jury confusion that those prior statements may create if admitted. <u>See</u> Fed. R. Ev. 403. To determine the value of impeaching Ms. Carlen, then, we must examine her testimony as a whole. <u>See</u>, <u>e.g.</u>, <u>United States v. Ince</u>, 21 F.3d at 581-82; <u>United States v.</u>

Johnson, 802 F.2d 1459, 1466 n.17 (D.C. Cir. 1986); and United States v. Crouch, 731 F.2d 621, 624 (9th Cir. 1984), cert. denied, 469 U.S. 1105 (1985).

Ms. Carlen testified that around 1991 or 1992, she "became aware" that Mr. Logan "was going [by car] to California to get methamphetamine" and that he made a "[c]ouple" of such trips. Ms. Carlen said that in 1991 or 1992 she and her sister (Mr. Logan's wife at that time) went on one of those trips. Ms. Carlen also stated that she later "heard ... from people" that Mr. Logan was receiving methamphetamine "in the mail, by Federal Express or UPS" (Mr. Logan made no objection to this hearsay). Around that time, Ms. Carlen said, she began to buy methamphetamine "from friends, other people," "but not from Mr. Logan." Ms. Carlen further stated that she sometimes sold up to half a gram of methamphetamine to support her own purchases of the drug. She denied telling the state police officer that Mr. Logan had "fronted" to her, for resale, one or two ounces of methamphetamine at a time at $1,700 per ounce (the officer did not testify about a statement to this effect). As noted above, Ms. Carlen also denied seeing Mr. Logan "counting a large sum of money," denied meeting anyone named "Ronnie," and denied hearing from Mr. Logan that he lost $25,000 because of a drug shipment that was intercepted by the police.

Quite frankly, we see more damage than assistance to Mr. Logan in Ms. Carlen's testimony. At best, the prior statements could cast doubt on the truthfulness of Ms. Carlen's denial that Mr. Logan ever sold or "fronted" methamphetamine to her. Most of the remainder of Ms. Carlen's testimony was neither exculpatory nor inculpatory. The testimony about Mr. Logan's trips to California seems to be more incriminating, moreover, than any effect that could be attributed to establishing that Mr. Logan sold methamphetamine specifically to Ms. Carlen (contrary to her denial). Testimony about an intercepted drug shipment, furthermore, also came from other witnesses so that Ms. Carlen's denial of a conversation about such a shipment was relatively unimportant.

It appears to us, therefore, that the value of impeaching Ms. Carlen as a witness was relatively low, whereas the danger of unfair prejudice and jury confusion -- specifically, the danger of the jury's using Ms. Carlen's prior statements as substantive evidence -- was very high. It is true that the trial court properly instructed the jury on impeachment and prior inconsistent statements. That instruction was given, however, not at the time of the state police officer's testimony but at the end of the trial, and the commentators have remarked on "the inefficacy of a limiting instruction," <u>see</u> 28 Wright and Gold, <u>Federal Practice</u> § 6206 at 535, in any event, in these circumstances.

Our assessment of the prior statements as creating a danger of unfair prejudice and jury confusion is reinforced by the fact that the government elicited, through the state police officer's testimony, additional inculpatory statements that Ms. Carlen allegedly made to the officer. That testimony was to the effect that Mr. Logan received methamphetamine shipments in the mail or through Federal Express or UPS every two to four weeks and that Mr. Logan began with approximately four to six ounces of methamphetamine in each shipment and later received approximately one to three pounds at a time. None of that testimony was admissible as impeachment evidence, because Ms. Carlen did not deny having made such statements (the government never examined her with respect to these matters). <u>See</u>, <u>e.g.</u>, <u>United States v. Dennis</u>, 625 F.2d 782, 796 (8th Cir. 1980); <u>see</u> <u>also</u> <u>United States v. Devine</u>, 934 F.2d 1325, 1344 (5th Cir. 1991), <u>cert.</u> <u>denied</u>, 502 U.S. 929 (1991), 502 U.S. 1047, 1064, 1065, 1092, 1104, 503 U.S. 999 (1992). The only possible relevance that that testimony could have had was as substantive evidence, yet it was clearly hearsay for those purposes. <u>See</u> Fed. R. Ev. 801(c). It was therefore manifestly inadmissible.

In short, although the state police officer's testimony had some impeachment value, that value was far outweighed by the danger of unfair prejudice and jury confusion that also accompanied the officer's testimony. The trial court therefore

committed "error" that was "plain," within the meaning of Fed. R. Crim. P. 52(b), in admitting the officer's testimony. See, e.g., United States v. Olano, 507 U.S. 725, 732-34 (1993). See also Johnson v. United States, 117 S. Ct. 1544, 1549 (1997); United States v. Hill, 91 F.3d 1064, 1072 (8th Cir. 1996); and United States v. Webster, 84 F.3d 1056, 1066 (8th Cir. 1996). Our next inquiry is whether the trial court's action was prejudicial to Mr. Logan, i.e., whether it affected the outcome of his trial. See, e.g., United States v. Olano, 507 U.S. at 734; see also Johnson v. United States, 117 S. Ct. at 1549, and United States v. Webster, 84 F.3d at 1066.

### III.

Other witnesses testified that the police intercepted a package in early 1993 that was intended to be sent through UPS from California to "Don Howard" at the address in Illinois where Mr. Logan lived at that time with his girlfriend; the package contained almost a pound of methamphetamine. A different girlfriend testified that Mr. Logan sometimes received telephone calls from "Ronnie" at an address in Illinois where Mr. Logan lived later in 1993 and in 1994. In addition, between late 1992 and mid-1993, Ronnie and Henrietta Furnish (co-defendants whose cases we do not address here) received at least $9,000 in five wire transfers to California from "Dave Hogan" (or "Hagan") and "Dan Long" in Illinois. Two handwriting samples from those wire transfers were identified by a document examiner as probably being written by Mr. Logan, "based on [a] reasonable degree of scientific certainty in the field of handwriting analysis." Another witness testified that during 1992 and 1993, he bought methamphetamine from Mr. Logan in one-ounce quantities roughly "[e]very two or three days," sometimes on credit. The witness testified further that he sold part of that methamphetamine to pay Mr. Logan and used the rest. Finally, Ms. Carlen never recanted or disclaimed her testimony that Mr. Logan was obtaining methamphetamine from California in 1991 or 1992.

It appears to us that nearly all of Ms. Carlen's alleged statements to the state police officer were cumulative to the other evidence against Mr. Logan, and therefore

probably negligible in additional effect. We believe, moreover, that from all of that evidence (and excluding the officer's testimony about Ms. Carlen's statements to him), the jury would have concluded, beyond a reasonable doubt, that, using an alias, Mr. Logan ordered methamphetamine from California, at least once during the period of the conspiracy, in a quantity large enough to support an inference of intent to distribute on his part; that, using an alias, Mr. Logan wired money to the Furnishes (co-defendants) in California to pay for shipments of drugs; and that he sold methamphetamine to at least one other person on a somewhat regular basis in amounts large enough to suggest an intent for or knowledge of, on the part of Mr. Logan, further distribution by that person.

We conclude, therefore, that even though the trial court should not have admitted the state police officer's testimony about Ms. Carlen's statements, that error did not "affect[] [Mr. Logan's] substantial rights." See Fed. R. Crim. P. 52(b); see also United States v. Patterson, 23 F.3d 1239, 1246 n.7 (7th Cir. 1994), cert. denied, 513 U.S. 1007 (1994). In other words, the error was not legally significant within the meaning of Fed. R. Crim. P. 52(b). We need not consider, then, whether the fairness, integrity, or public reputation of judicial proceedings was seriously affected by the admission of the officer's testimony. See, e.g., United States v. Olano, 507 U.S. at 736. See also Johnson v. United States, 117 S. Ct. at 1549-50; United States v. Robinson, 110 F.3d 1320, 1324 (8th Cir. 1997); and United States v. Miner, 108 F.3d 967, 969 (8th Cir. 1997).

IV.

During trial, the court admitted evidence that in 1990, Mr. Logan was stopped in Texas for a traffic violation and subsequently arrested for possession of a little more than a fourth of a gram of methamphetamine. The arresting officer characterized the amount of methamphetamine found as "a personal amount" that would be "almost impossible" "to break ... up and distribute and sell." The officer further testified that he also found a razor blade and a short straw (which, the officer agreed, were "used primarily for ... methamphetamine") in the glove compartment of Mr. Logan's car.

Finally, the officer testified that Mr. Logan stated at the time of the arrest that "the ... 'dope' was his" (rather than his wife's, presumably).

Mr. Logan challenges the admission of all of that evidence, contending that it was not relevant to the crime charged, since it involved an amount consistent with personal use only, rather than distribution, and, even if relevant, that its unfair prejudicial effect far outweighed any probative value that it had. See Fed. R. Ev. 403. We disagree.

Evidence of "other crimes, wrongs, or acts" by a defendant, see Fed. R. Ev. 404(b), is inadmissible only if it is relevant solely on the question of a defendant's "character or ... propensity to commit the crime charged." United States v. Jones, 990 F.2d 1047, 1050 (8th Cir. 1993), cert. denied, 510 U.S. 1048 (1994). Such evidence is admissible if it is "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged." United States v. Campbell, 937 F.2d 404, 406 (8th Cir. 1991).

Our court has held that evidence of prior possession of drugs, even in an amount consistent only with personal use, is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element. See, e.g., United States v. Powell, 39 F.3d 894, 896 (8th Cir. 1994), and United States v. Brown, 956 F.2d 782, 786-87 (8th Cir. 1992); see also United States v. Templeman, 965 F.2d 617, 619 (8th Cir. 1992), cert. denied, 506 U.S. 980 (1992). This is so even if the defendant has not raised a defense based on lack of knowledge or lack of intent. See, e.g., United States v. Escobar, 50 F.3d 1414, 1422 (8th Cir. 1995), and United States v. Aranda, 963 F.2d 211, 215 (8th Cir. 1992). We therefore see no error in the trial court's admission of the evidence about Mr. Logan's prior arrest for possession of methamphetamine, especially since the trial court also instructed the jurors that they could not use the evidence "to decide whether [Mr. Logan] carried out the acts involved in the crime charged" but that if they were convinced, beyond a

-10-

reasonable doubt, by other evidence that Mr. Logan had indeed carried out the acts involved in the crime charged, they could "use this evidence concerning previous acts to decide intent, knowledge, or common scheme or plan." See Fed. R. Ev. 404(b).

V.

At sentencing, the trial court attributed from three to ten kilograms of methamphetamine and/or heroin to Mr. Logan. That attribution meant that his base offense was set at level 34 under the federal sentencing guidelines. See U.S.S.G. § 2D1.1(a)(3), § 2D1.1(c)(3). Mr. Logan challenges that attribution, arguing that the evidence did not support a finding of such a large amount.

There was testimony at trial (no additional evidence was presented at sentencing) that during the period of the conspiracy, a package containing approximately 450 grams of methamphetamine was sent from California to the address where Mr. Logan lived; although that package was intercepted by the police, at sentencing even Mr. Logan conceded that the amount of drugs in it could be attributed to him for sentencing purposes. In addition, one witness testified that between fall, 1992, and spring, 1993, he bought one ounce of methamphetamine every two or three days from Mr. Logan. Even assuming purchases of one ounce every two days from that testimony for the period from December, 1992 (when the conspiracy allegedly began), through April, 1993, though, those purchases would total approximately 2,137 grams at most. Finally, several witnesses testified that methamphetamine cost about $1,000 per ounce. Assuming that the $9,000 that can fairly be associated with Mr. Logan in wire transfers to Ronnie and Henrietta Furnish (co-defendants whose cases we do not address here) was for the purchase of nine ounces of methamphetamine, that amount would be approximately 255 grams. All three of those quantities, however, total only 2,842 grams, less than the three kilograms required to sustain the base offense level given to Mr. Logan.

At sentencing, the trial court made no findings with respect to other conspirators whose drug amounts should be attributed to Mr. Logan. Instead, the court merely

"overrule[d]" Mr. Logan's objection to the amounts attributed to him. We cannot tell, therefore, what other drug amounts, if any, ought to have been included in determining his base offense level. We thus remand Mr. Logan's case for resentencing in light of these concerns. See e.g., United States v. Randolph, 101 F.3d 607, 609 (8th Cir. 1996), and United States v. Alexander, 982 F.2d 262, 267-68 (8th Cir. 1992).

## VI.

The trial court imposed a three-level increase in Mr. Logan's offense level, finding that Mr. Logan was a manager or supervisor in a criminal activity that involved five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1(b). Mr. Logan challenges the conclusion that he was a manager or supervisor (although the question is not completely free from doubt, it appears that he does not contest the size or scope of the conspiracy).

"To qualify for an adjustment under [U.S.S.G. § 3B1.1(b)], the defendant must have been the ... manager, or supervisor of one or more other participants." See U.S.S.G. § 3B1.1, application note 2. The only evidence at trial with respect to anything that might be construed as a managerial or supervisory role for Mr. Logan was the testimony of one witness who stated that he bought methamphetamine in one-ounce quantities from Mr. Logan "[e]very two or three days" -- whenever he would "run out" -- for "a short while."

The witness acknowledged that whenever he obtained some methamphetamine from Mr. Logan, he would "use some of [it] and then distribute some of [it], sell some of [it]." The witness also stated, however, that he had no "agreement with [Mr. Logan] to distribute the profits from those drugs," although Mr. Logan did sometimes "front" the methamphetamine to him. When that happened, the witness said, he would "sell it, make some money, and then pay [Mr. Logan]." The terms of those transactions, though, were that the witness would subsequently pay Mr. Logan only a fixed amount; "there was ... no splitting of the profits." We note as well that the witness stated that

he stopped buying from Mr. Logan when the "[p]roduct started being bad" -- when it "was cut" (diluted with some other substance).

We do not believe that that evidence is enough to sustain a finding that Mr. Logan was a manager or supervisor of the witness. In its brief, moreover, the government cites no other candidate as a potential participant managed or supervised by Mr. Logan. The amounts of money (at least $1,500 at a time) that Mr. Logan can fairly be charged with sending to Ronnie and Henrietta Furnish (co-defendants whose cases we do not address here) do allow the inference that Mr. Logan was buying methamphetamine in quantities appropriate for distribution. Status as a distributor, however, by itself is not sufficient to justify a finding that a defendant is a manager or supervisor. See, e.g., United States v. Bryson, 110 F.3d at 584. We therefore reverse the trial court's finding that Mr. Logan was a manager or supervisor.

## VII.

For the reasons stated, we affirm Mr. Logan's conviction but remand his case for resentencing.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-