# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2937

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Melroy Johnson, Sr., | * |
| | * |
| Appellant. | * |

_____

No. 01-3086

_____

Appeals from the United States
District Court for the
Northern District of Iowa.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellant, | * |
| | * |
| v. | * |
| | * |
| Melroy Johnson, Sr., | * |
| | * |
| Appellee. | * |

_____

Submitted:  May 14, 2002

Filed:  February 10, 2003

_____

Before WOLLMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Melroy Johnson, Sr. appeals his conviction on two counts of possession with intent to distribute cocaine base and one count of distribution of cocaine base, violations of 21 U.S.C. § 841(a)(1). The government cross-appeals from the five-year downward departure the district court granted based on Johnson's physical condition. We affirm the convictions and reverse and remand for resentencing.

**I.**

Based on information provided by a confidential informant, the Sioux City Police Department obtained search warrants for three residences associated with Johnson. The officers found crack cocaine at two of the residences, as well as drug paraphernalia and marijuana at one of the residences.

Johnson, who was born on July 10, 1955, was charged with possession with intent to distribute crack cocaine and distribution of crack cocaine. Over Johnson's objection on grounds of lack of relevancy, evidence regarding the marijuana was introduced by the government as proof that the drugs and drug paraphernalia belonged to Johnson. On appeal, Johnson argues that evidence of this small amount of "personal use" marijuana constituted inadmissible character evidence because it was admitted solely to show Johnson's disposition for criminal conduct. In a pro se brief, Johnson raises some objections to his sentence.

## II.

We turn first to Johnson's arguments. We review a district court's determination of relevance under an abuse of discretion standard. United States v. Taylor, 106 F.3d 801, 803 n.2 (8th Cir. 1997). "[E]vidence of prior possession of drugs, even in an amount consistent only with personal use, is admissible to show such things as knowledge and intent of a defendant charged with a crime in which intent to distribute drugs is an element." United States v. Logan, 121 F.3d 1172, 1178 (8th Cir. 1997). Accordingly, the district court did not abuse its discretion in admitting the evidence of the marijuana.

Because it was not raised in the district court, we decline to reach Johnson's contention that the marijuana should have been excluded as inadmissible character evidence under Federal Rules of Evidence 404(b). Dejan v. United States, 208 F.3d 682, 687 (8th Cir. 2000). The arguments raised in Johnson's pro se brief are without merit. Accordingly, we affirm the convictions on all three counts.

## III.

On cross-appeal, the government argues that the district court abused its discretion in granting a five-year downward departure based on Johnson's physical condition. Under U.S.S.G. § 5H1.4, a downward departure may be granted if the defendant suffers from an "extraordinary physical impairment."[1] Physical impairment

---

[1]U.S.S.G. § 5H1.4 states, in relevant part:

Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. However, an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range; e.g., in the case of a seriously infirm defendant, home

is, however, a discouraged basis for departure under the analysis set out in Koon v. United States. 518 U.S. 81, 95 (1996); see also United States v. Orozco-Rodriguez, 220 F.3d 940, 942 (8th Cir. 2000); United States v. LeBlanc, 24 F.3d 340, 348 (1st Cir. 1994). "The Commission does not view discouraged factors 'as necessarily inappropriate' bases for departure but says they should be relied upon only 'in exceptional cases.'" Koon, 518 U.S. at 95 (quoting 1995 U.S.S.G. ch. 5, pt. H, intro. comment.). We review a district court's decision to depart under an abuse of discretion standard. Koon, 518 U.S. at 99.

Following his conviction by a jury on January 6, 2000, Johnson was incarcerated pending his sentencing hearing. On March 13, 2000, Johnson was admitted to the Mercy Medical Center in Sioux City, Iowa, following his complaint of chest pains. Tests revealed that he had suffered a myocardial infarction, and a stent was inserted into his right coronary artery. Johnson was admitted to the Federal Medical Center at Rochester, Minnesota (FMC-Rochester), on March 15, 2000, for further evaluation of his cardiac problems and management of his diminished left ventricle function and coronary artery disease. He underwent a coronary angiogram at the Mayo Clinic on August 9 and on September 6, 2000, was transferred from FMC-Rochester to the custody of the United States Marshals Service.

At sentencing, the district court considered a report submitted by Johnson that was prepared by Arthur S. Leon, M.D., Professor of Exercise Science and Health Enhancement and Director of Laboratory of Physiological Hygiene and Exercise at the University of Minnesota. Dr. Leon, who did not examine Johnson personally, reviewed the medical records from the Mercy Medical Center and the Mayo Clinic. Based upon that review, Dr. Leon concluded that Johnson suffers from two potentially life-threatening health problems, i.e., coronary heart disease, with hypertension a contributing factor, and Hodgkin's disease. He found that the cardiac

---

detention may be as efficient as, and less costly than, imprisonment.

catheterization that Johnson underwent on August 9, 2000, revealed a marked improvement in his left ventricular ejection fraction, resulting in a nearly normal ejection fraction of 49%. As of August 2000, physical examinations and chest x-rays revealed no evidence of congestive heart failure. Dr. Leon's report states that although Johnson clearly has severe coronary artery disease, with extensive permanent heart damage, thanks to the excellent medical management at the Mayo Clinic his heart function is currently well compensated. He noted that Johnson's cardiologist had recommended that Johnson continue medical therapy, that he could perform normal physical activities, and that he was not a candidate for any further revascular procedures at that time. Dr. Leon rated Johnson's current functional capacity, based on the New York Heart Association Classification System, "as 2 on a scale of 1 (no limitations) to 4 (severe incapacitation)." He opined that Johnson has "an estimated 10% to 20% possibility of a recurrent fatal or nonfatal coronary event in the next 5 years." Dr. Leon noted that Johnson "would benefit a great deal in terms of quality of life, as well as an improved prognosis by a formal, physician-supervised, cardiac rehabilitation program as described in one of my recent publications."

Dr. Leon found that Johnson's Hodgkin's disease was currently in remission, that it had been adequately treated some eight years earlier, and that "he has a good prognosis with a high probability of a cure."

Dr. Leon concluded his report by stating that although Johnson has multiple medical problems, "[w]ith aggressive medical management at the Mayo Clinic his cardiac status currently is stable with just moderate functional impairment; however, his long range prognosis is guarded with a 10 to 20% probability of a recurrent nonfatal or fatal coronary event in the next five years. Continued regular medical care by a cardiologist is essential for management of his heart problem."

In rebuttal, the government submitted an affidavit from Ronald Ilvedson, M.D., a staff physician at FMC-Rochester, in which Dr. Ilvedson stated that the Federal

Bureau of Prisons provides a full range of medical services at each of its 91 institutions. The affidavit recounted the medical treatment that was provided to Johnson by the cardiologists at the Mayo Clinic during Johnson's stay at FMC-Rochester prior to his sentencing, including the August 9, 2000, coronary angiogram referred to in Dr. Leon's report. Dr. Ilvedson stated that the members of the medical staff at FMC-Rochester routinely encounter patients who present with diagnoses the same or similar to Johnson's, that Johnson's condition is not unlike other inmates currently situated with the Bureau of Prisons, and that Johnson's care could be managed during his incarceration.

The district court continued the sentencing hearing so as to be able to conduct a teleconference with personnel at FMC-Rochester to determine what cardiac rehabilitation services are available at the institutions operated by the Bureau of Prisons. During the teleconference, the associate warden of medical services at FMC-Rochester described the cardiac rehabilitation services that are available at that institution and at the other institutions operated by the Bureau of Prisons. Following the warden's presentation, Dr. Ilvedson stated that if Johnson were to be returned to FMC-Rochester he would be put on a physician-supervised cardiac rehabilitation program. He stated that when Johnson left FMC-Rochester in September of 2000, he was doing well with most of his medical problems: his Hodgkin's disease had not recurred; his cholesterol and blood pressure were controlled; he was not smoking; and his most recent coronary angiogram revealed no reason for surgery.

The district court found that Johnson suffers from an extraordinary physical impairment. It then addressed the three questions that must be answered for each defendant who claims the benefit of § 5H1.4: (1) whether the defendant's physical condition is such that the defendant would find imprisonment more than the normal hardship; (2) whether imprisonment would subject the defendant to more than the normal inconvenience or danger; and (3) whether the defendant's physical condition

has any substantial present effect on the defendant's ability to function. <u>United States v. Rabins</u>, 63 F.3d 721, 729 (8th Cir. 1995).

The district court expressed its uncertainty whether all three of these questions must be answered for each defendant or whether a positive answer to only one or two of them would suffice to constitute the basis for a § 5H1.4 downward departure.

The district court then found, agreeing with the government's position, that imprisonment would not constitute more than the normal hardship for Johnson even in light of Johnson's extraordinary physical impairment.

Likewise, the district court agreed with the government's position that imprisonment would not subject Johnson to more than the normal inconvenience or danger, alluding to Dr. Ilvedson's statement that Johnson would be put on supervised cardiac rehabilitation and observing that there is a greater likelihood that Johnson's condition would be monitored and his cardiac rehabilitation regimen complied with if Johnson were in prison than it otherwise would be.

With respect to the third <u>Rabins</u> question, whether Johnson's physical condition had a substantial present effect on his ability to function, the district court stated:

> I think it does. While, you know, I think he's capable of walking, brushing his teeth, and those types of things, I think there will be a wide range of things even in prison that he'll probably be unable to do. And I just think based on the doctor – Dr. Leon's report, he indicates that he has moderate functional impairment but the long-range prognosis is guarded and he has severe coronary artery disease. And I'm willing to conclude from that that the defendant does have a substantial present effect on his ability to function [sic].

The district court found that Johnson's offense level was 34 and his criminal history category V, resulting in a guidelines range of 235 to 293 months' imprisonment (with a 10-year mandatory minimum sentence on the two possession-with-intent-to-distribute counts). The court departed downward from the guidelines range and imposed concurrent sentences of 175 months on each of the three counts on which Johnson had been convicted. We conclude that the court erred in doing so.

We conclude that the district court's finding that Johnson suffers from an extraordinary physical impairment, resulted from an improper application of the law. As we stated in Rabins, the phrase "extraordinary physical impairment" "should be interpreted according to its manifest purpose." 63 F.3d at 729. Thus, rather than being viewed in the abstract, a defendant's physical condition must be assessed in the light of the situation the defendant would encounter while imprisoned. As the Seventh Circuit has held, "An ailment also might usefully be called 'extraordinary' if it is substantially more dangerous for prisoners than non-prisoners. Then imprisonment would shorten the defendant's life span, making a given term a more harsh punishment than the same term for a healthy person." United States v. Krilich, 257 F.3d 689, 693 (7th Cir. 2001).

When so assessed, Johnson's physical impairment, although concededly serious, is not extraordinary. As the district court found, imprisonment would not constitute more than normal hardship for Johnson, nor would it subject him to more than normal inconvenience or danger. With all due respect to the district court's on-the-scene opportunity to observe Johnson, we find no support in the record for a finding that Johnson's physical impairment would have a substantial present effect on his ability to function within the confines of a prison environment. Johnson's heart problems obviously restrict the scope of his exertional activities, but that will be no more the case in prison than in the outside world, and it is in the light of the prison environment that those restrictions must be weighed.

Accordingly, we conclude that the district court abused its discretion in granting a downward departure based on Johnson's physical condition. The record simply does not support a finding that Johnson's physical impairment is so severe that it falls within the definition set forth in § 5H1.4 and as interpreted in Rabins.

We do not reach this conclusion lightly, for we are mindful of the broad discretion that district courts are entitled to exercise in determining whether a downward departure is warranted under the sentencing guidelines. That discretion must be exercised on the basis of a finding fairly supported by facts in the record, however, and when that factual support is lacking we on the appellate courts have a duty to correct what we perceive to be error.

The convictions are affirmed, the sentence is reversed, and the case is remanded to the district court for resentencing.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent from the majority's reversal of the district court's five-year downward departure based on Melroy Johnson, Sr.'s extraordinary physical condition. The majority has substituted its perception of the facts for the thorough findings of an experienced and able chief district court judge. The district court did not abuse its discretion; the court made its factual findings with care and discernment. This panel should afford proper deference to those findings. Furthermore, the majority fails to clarify the applicability of United States v. Rabins, 63 F.3d 721 (8th Cir. 1995), despite the district court's repeated expressions of uncertainty on how to conduct § 5H1.4 downward departure analysis under Rabins.

The majority concludes that the district court's finding that Johnson suffers from an extraordinary physical impairment "resulted from an improper application of the law." However, after cursory citations to Rabins and United States v. Krilich,

-9-

257 F.3d 689 (7th Cir. 2001),[2] the majority opinion does not explain what a *proper* application of the law would have been. Instead, it conducts its own assessment of the facts and concludes that "Johnson's physical impairment, although concededly serious, is not extraordinary." This type of determination is precisely the sort that should be left to the sound discretion of the district court. The distinction between labeling a physical condition as "serious" or as "extraordinary" is best done by the finder of fact.

As the Supreme Court recognized in <u>Koon v. United States</u>, 518 U.S. 81, 98 (1996), "A district court's decision to depart from the Guidelines . . . will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." <u>Koon</u> laid out the proper role for the sentencing court in resolving whether departure is warranted by the facts of an individual case:

> To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases. District courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guidelines cases than appellate courts do.

---

[2]It is entirely unclear how the majority intends future district courts to conduct § 5H1.4 downward departure analysis. The majority does not reconcile the Seventh Circuit's analysis in <u>Krilich</u> with the <u>Rabins</u> decision. For example, it does not explain how <u>Krilich</u>'s focus on whether the "prison medical facilities [can] cope" with the defendant's medical problem should be incorporated into the three <u>Rabins</u> questions. <u>Krilich</u>, 257 F.3d at 693. Simply citing these two decisions does not provide the type of legal analysis the district court in this matter requested.

Id.[3]  It is the job of the district courts, not the appellate courts, to find facts.  United States v. Searcy, 284 F.3d 938, 943 (8th Cir. 2002).

There can be no valid contention that the district court failed to make a "refined assessment" of the facts in this case.  A review of the sentencing transcript reveals the thoughtfulness with which the court approached its duty.  At the initial sentencing hearing, Johnson presented the court with a letter from Dr. Diane K. Werth, the doctor who treated Johnson at the Sioux City emergency room on March 10, 2000.  The government introduced a declaration from Dr. Ronald Ilvedson, staff physician at FMC Rochester.

Based upon this initial showing, the district court denied Johnson's motion for downward departure.  Treating Johnson's oral allocution as a motion to reconsider, the district court continued the sentencing in order to give Johnson an opportunity to present additional medical evidence.  At the next sentencing hearing, Johnson offered a letter from Dr. Arthur S. Leon, a physician at the University of Minnesota.  The government did not dispute the substance of Dr. Leon's report or Dr. Leon's statement that Johnson was "seriously infirm," in accordance with the use of the term in the example given in Guideline § 5H1.4.

Again, the district court continued the sentencing after indicating that it wanted to know whether cardiac rehabilitation was available in the Bureau of Prisons.  A

---

[3]The above statement from Koon reminds this writer of a comment made by the late Chief Justice Warren Burger at New York University's summer session for appellate court judges in 1969.  Chief Justice Burger, in response to this writer's inquiry about federal appellate court judges reviewing sentences imposed by district courts, stated in substance that appellate court judges know very little about sentencing and those sort of decisions should remain largely in the purview of experienced district court judges.

third sentencing hearing was held on July 26, 2001, during which Dr. Ilvedson and David Good, the associate warden for medical services at FMC Rochester, testified via video conference at the district court's request. Only after hearing arguments at three separate hearings, receiving the opinions of multiple medical experts, and applying its own experience in sentencing cases did the court conclude that for the purposes of Guideline § 5H1.4, Johnson had an "extraordinary physical impairment."

Throughout the sentencing transcript, the district court indicates its desire to proceed cautiously and with a complete understanding of the issues. After initially denying Johnson's request for a downward departure, the trial court reconsidered its position, stating:

> I have some uneasiness that there may be medical testimony out there that might change my opinion . . . . [M]y one rule in this job is I do like to sleep well at night, and I would not sleep well at night if I didn't give the defendant -- that's not a legal principle, but that's a very important principle to me, sleeping well at night, and I have sufficient reservation which I had when I started reviewing the motion for downward departure that there may be medical information there that might change my opinion.

(Sentencing Tr. 12/20/00, 52-53).

During the second sentencing hearing, the court did not have evidence on whether or not the Bureau of Prisons made cardiac rehabilitation available to prisoners. Not wanting to simply assume or guess, the court again continued the hearing in order to take testimony from Bureau of Prisons officials via video

-12-

conference.[4] At the third and final hearing, the district court unequivocally found that Johnson had an extraordinary physical impairment.[5]

_____

[4]The court stated:

> On the other hand, you know, I don't have a crystal ball, and I don't know the answer to the question. And I think the answer to the question for me might be dispositive of how I would rule. And because this is an important matter, I hate to just take a guess as to what the answer is because I think both sides are entitled to something better than my best judgment on it when I think there's an answer.

(Sentencing Tr. 5/26/01, 81).

[5]The district court stated:

> Well, I find -- first of all, I'm going to adopt as my factual findings in the case Defendant's Exhibit AA, the medical report by Dr. Leon, and I basically adopt the entire report as my factual findings, but I want to focus on the last page including the summary, and Dr. Leon indicates Mr. Johnson has multiple medical problems, the most serious of which is severe coronary artery disease which has resulted in two heart attacks and a left ventricle of the heart replaced by scar tissue and is therefore nonfunctional -- over half of the left ventricle of the heart is replaced by scar tissue; and, therefore, the left ventricle is nonfunctional.
>
> And based on all of the medical findings by Dr. Leon, I find that the defendant easily meets the requirement of extraordinary physical impairment. To me that's an easy call.
> Now, whether or not I should depart is a much more difficult question. But on the central question of whether he has an extraordinary physical impairment, I find that he does. And I find that by -- beyond a reasonable doubt in my mind that he has an extraordinary physical impairment even though I only have to make the finding by a preponderance of the evidence. I find that the evidence is overwhelming that this defendant has an extraordinary physical impairment.

Despite this careful and thorough factual record, the majority opts to disagree with the district court by classifying Johnson's physical condition as serious but not extraordinary when "assessed in the light of the situation the defendant would encounter while imprisoned." The majority concludes that the district court's finding of extraordinary medical condition is not fairly supported by facts in the record. Under that view, according to the majority, the district court abused its discretion in its role as a finder of fact.

There are two reasons the majority's conclusion is particularly troubling. First, the district court could not have been more certain in its ruling that Johnson suffers from an extraordinary impairment. It is difficult to imagine what more evidence the district court could have heard on this matter. The factual record is replete with medical evidence and specific findings. Second, while the district court expressed no doubt about its factual conclusions, it expressed *great* uncertainty about the legal conclusions it made: "And it's I think the most difficult departure area that I see where it seems more unsettled and more ambiguous at least to me. And I hope maybe if there is an appeal that we do get some clarification." (Sentencing Tr. 7/25/01, 136).[6] The majority does not elucidate exactly how the district court erred in its application of the law, despite a clear invitation by that court to review its legal conclusions and clarify the law.

---

(Sentencing Tr. 7/25/01, 119-20).

[6]At another point during sentencing the court asked the government:

> And my first question for you, Mr. Deegan, is I've never been clear as to whether or not the answer has to be yes to all three [Rabins] questions, whether you can balance the three. It really doesn't say that -- it just says these questions must be answered for each individual defendant . . . . [U]ntil the Eighth Circuit clarifies it, I find it ambiguous.

(Sentencing Tr. 7/25/01, 121).

At the first sentencing hearing, the district court presented its understanding of the downward departure inquiry: first the court determines whether the defendant has an extraordinary medical condition based on factual information, and then the court decides whether that condition is present to such an exceptional degree that it is sufficiently outside the heartland of typical cases. See United States v. Reinke, 283 F.3d 918, 923 (8th Cir. 2002) (explaining the "heartland" analysis under the Guidelines and Koon). The three questions from United States v. Rabins apply to the second prong of this analysis. The government agreed with the court's understanding of how to conduct its departure inquiry.[7]

Having found that Johnson had an extraordinary medical condition, the district court turned to the "much more difficult question" of whether or not to depart. In this decision, the court looked to the three questions presented in United States v. Rabins for guidance. The court proceeded to make findings about whether or not Johnson's extraordinary condition fell outside the heartland of typical cases. The district court was quite frank about its uncertainty regarding the state of the law:

> Well, I'm comfortable with my finding that Mr. Johnson suffers from an extraordinary physical impairment. I'm a lot less comfortable about the additional rulings I'm going to make now. And I -- you know, I'm not sure what the exact test is, and I'll just be honest about that. I don't know whether the three factors in Rabins survive the Koon decision or not. And if they do, I don't know whether there has to be a yes answer to all three to make a departure.

---

[7]At the second sentencing hearing the government stated, "[O]nce you find an extraordinary physical impairment, then you ask those questions that Judge Arnold laid out to determine whether it's the type of extraordinary physical impairment that the guidelines are talking about in 5H1.4." The court responded, "Okay. That's my understanding. We're on the same wavelength there." (Sentencing Tr. 5/29/01, 67).

-15-

I am going to make a departure. And if the Rabins three questions survive and there have to be a yes answer to all three, I've already indicated no to two of the three. So I concede error in my departure.

(Sentencing Tr. 7/25/01, 135).

Despite the district court's repeated expressions of uncertainty about this circuit's case law on departures for extraordinary physical conditions, the panel opinion takes no steps to clarify the situation. If anything, it further muddies the waters by conflating the factual finding prong of the departure analysis with the heartland analysis prong.

The majority relies on the three <u>Rabins</u> questions in its assessment of whether Johnson suffers from an extraordinary physical impairment. However, as the district court recognized at sentencing and as the government acknowledged, the <u>Rabins</u> factors are used as a means of measuring whether extraordinary conditions are present to such an exceptional degree that they fall outside the heartland of typical cases as a matter of law. The questions are not tools for interpreting medical diagnoses and prognoses.

The district court found the first two out of three factors discussed in <u>Rabins</u>, 63 F.3d at 729, weighed against a departure. The district court observed that both factors addressed Johnson's physical condition vis-a-vis imprisonment, and that a high level of care available in the Bureau of Prisons would take care of defendant's medical needs. With regard to the third <u>Rabins</u> factor, the court found that Johnson's physical condition had a substantial present effect on his ability to function. The court then made the more general finding that Johnson's medical condition fell "outside the heartland of defendants that I see."

-16-

The majority notes the district court's "uncertainty whether all three of these questions must be answered for each defendant or whether a positive answer to only one or two of them would suffice." At the conclusion of the opinion, this is still an open question. Leaving this matter unresolved in a published opinion is a great disservice to sentencing courts. At a minimum, the majority should have clarified the law–a proper function of federal appellate courts.

In addition to not clarifying the state of the law, the panel opinion indicates that all three Rabins inquiries are to be evaluated in terms of imprisonment. The extraordinariness of a physical condition is to be "assessed in the light of the situation the defendant would encounter while imprisoned." There is nothing in the Rabins decision to support this reading. The third question is simply, "Does the physical condition have any substantial present effect on the defendant's ability to function?" Rabins, 63 F.3d at 729. Furthermore, the government does not share this perception or argue this position before the panel. In its brief, the government described the third Rabins factor as "a factor which has nothing to do with incarceration." (Government's Br. at 48).

Finally, the panel opinion does not resolve the difficult matter of how to measure the "heartland" of typical cases in these types of departures. The majority intimates that the heartland is to be judged in terms of the overall prison population, but does not explicitly articulate its view. The district court considered this issue and ultimately concluded that the heartland is to be assessed based on the sentencing court's expertise, i.e., based on the heartland of defendants that it sees. Again, the sincere uncertainty of the district court has been left unresolved in a case that squarely presents the matter for review.[8]

---

[8]The following statements by the district court reveal yet another unclear area in this type of case:

I think I've virtually read all the other Eighth Circuit cases on this

-17-

As the discussion in this dissent emphasizes, I believe that the sentencing judge in this case carefully assessed and made findings of facts, including those of credibility, and applied those facts to the law as it appeared to him.

In the area of imposing sentences, Congress and the Sentencing Commission have removed much of the discretion from sentencing judges and have handed it over to non-judges, such as probation officers and United States attorneys. Nonetheless, the district court judges retain a critical role in making findings, assessing credibility, and relying on those findings to impose the sentence. Those duties are important and even awesome.

I say to the district court judge in this matter, and to other federal district court judges who impose sentences: do not surrender those duties and important functions,

---

departure as well as a smattering of cases from the other circuits.

One of the issues I have is there's kind of a theme that you see in these cases which is . . . the fact that the cases talk about whether or not somebody can receive adequate treatment for their condition in the Bureau of Prisons.

Here is my kind of overall question for you. I've never exactly understood what the significance of that is in terms of this downward departure. In other words, it doesn't seem that it's a prerequisite. In other words, you don't have to find some incredibly obscure condition that the Bureau of Prisons has never heard of or doesn't believe they can treat in order to have discretion to grant the downward departure, at least that's my understanding.

But, on the other hand, this issue about how the Bureau of Prisons would deal with the medical condition and their ability to treat it seems to come up in virtually every case. So I'm wondering, if it's not a requirement, exactly what is the significance of the ability of the BOP to treat the condition?

(Sentencing Tr. 12/20/00, 35-36).

notwithstanding disagreements with your appellate colleagues, such as in this case. These functions belong to the district court, need to be in the district court, and should remain there.

I respectfully dissent in this matter because the district court's factual findings deserve deference from this panel and the majority's treatment of this case offers far more questions and ambiguities than resolutions.[9]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[9]It is ironic that the dissent in <u>Rabins</u> notes the district court as saying it would "be delighted to have some more specific guidance from the Eighth Circuit" on the issue of whether a deteriorating physical condition due to HIV-positive status can be a factor considered for downward departure. 62 F.3d at 733. The dissent in <u>Rabins</u> faults the majority for not providing that requested guidance. Here, too, the sentencing judge sought guidance on appeal but obtains only apparent rejection of his careful, thoughtful findings.