# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 06-1020

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Wesley J. Durham, | * | |
| | * | |
| Appellant. | * | |

_____

No. 06-1021

_____

Appeals from the United States
District Court for the
Western District of Missouri.

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Erica J. Duncan, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: September 25, 2006
Filed: December 5, 2006

_____

Before WOLLMAN, BRIGHT, and BOWMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Wesley Durham and Erica Duncan (hereinafter referred to by their last names or collectively as "the defendants") were convicted of attempting to manufacture five or more grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and possessing pseudophedrine with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1). Duncan was additionally convicted of conspiring to manufacture and distribute five or more grams of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. The district court[1] sentenced Durham to 235 months of imprisonment and Duncan to 151 months of imprisonment. They appeal from their respective convictions and sentences. We affirm.

## I.

On or about November 1, 2003, Durham and Duncan, along with their four-week-old son, Mason, moved in with Bruce Williamson. In the early morning of December 12, 2003, Duncan discovered that Mason had stopped breathing. Williamson drove Duncan, Durham, and Mason to a hospital, where Mason was pronounced dead shortly thereafter. Upon learning of Mason's death, Williamson left the hospital and returned home. The doctors examined Mason and found no signs of physical abuse.

Mason's death was immediately reported to the Lee's Summit police department, and officers were sent to the hospital to investigate. After conducting interviews with Durham, Duncan, and the hospital staff, the officers proceeded to the couple's residence to investigate further. The officers viewed the bedroom where Mason slept and then proceeded to secure the residence pending the application for

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

a search warrant. During this process, they learned that Williamson had several outstanding arrest warrants and took him into custody. A search warrant was subsequently issued and the police searched the residence and garage. Items consistent with the manufacturing of methamphetamine were located throughout the residence, including the bedroom that Durham, Duncan, and Mason occupied. Several weeks later, the results of an autopsy determined the cause of Mason's death to be Sudden Infant Death Syndrome (SIDS).

Durham and Duncan were subsequently charged with conspiring to manufacture methamphetamine, attempting to manufacture methamphetamine, and possessing pseudophedrine with the intent to manufacture methamphetamine. They filed pre-trial motions to suppress evidence seized pursuant to the search warrant, arguing that the warrant was overbroad, that the affidavit failed to establish probable cause, and that the affidavit contained errors and omissions that rendered it defective. Following a suppression hearing, a magistrate judge[2] issued a report and recommendation that the motions be denied. The district court adopted the report and denied the motions.

Williamson, who had earlier pled guilty to a charge of conspiracy to manufacture and distribute methamphetamine, testified on behalf of the government pursuant to a plea agreement. He stated that he had observed Durham manufacture methamphetamine at his (Williamson's) apartment on at least eight to ten occasions during the period from early November 2003 to December 12, 2003. Williamson obtained the pills and other necessary ingredients for the manufacturing process. He testified that he had observed Duncan tear from the striker plates the matches that were used to create the red phosphorous needed during the manufacturing process. Williamson further testified that he had witnessed Durham sell methamphetamine on numerous occasions during the November-December period.

---

[2]The Honorable Robert E. Larsen, United States Magistrate Judge for the Western District of Missouri.

Continuing with its case, the government called Corey Hall as a witness. Hall had been to Williamson's residence and had stayed there on at least one occasion. During direct examination, the government asked Hall whether during an interview he had had with Detective Dan Wood he had made statements regarding the defendants' use and manufacture of methamphetamine at Williamson's residence. Hall denied making any such statements. On cross-examination, Hall was asked whether "the detective was spoon-feeding you what he would like you to say" and "telling you the answers he wanted to hear," to which Hall responded "[r]ight, he was asking me questions that I knew nothing about and knowledge he already had and, you know, pretty much telling me I knew about this when I didn't." Continuing, Hall further testified that he had never seen the defendants cook, sell, or buy methamphetamine. The government thereafter called Wood to impeach Hall's testimony. The district court overruled the defendants' objections to this line of questioning, but instructed the jury that it could consider Wood's testimony only in determining Hall's credibility and not as proof of the matters asserted. Wood then proceeded to testify that Hall had told him that he had seen Durham and Duncan use and manufacture methamphetamine at Williamson's residence.

The defendants attempted to call Karen Homes, Williamson's ex-wife, as a witness to impeach Williamson's testimony. Sustaining the government's objection and rejecting the defendants' offer of proof, the district court determined that Homes's proposed testimony would not impeach Williamson's in-court testimony and thus did not allow her to testify.

At sentencing, the district court gave both defendants a six-level enhancement under section 2D1.1(b)(6)(C) of the sentencing guidelines for creating a substantial risk of harm to a minor.[3] The district court denied Duncan's request for a minor-participant reduction under section 3B1.2 of the guidelines.

---

[3]The relevant section has been changed to 2D1.1(b)(8)(C).

## II.

Durham and Duncan raise several issues on appeal, which we will consider in turn.

## A.

We turn first to the contention that the district court erred when it allowed Wood to testify and rejected Homes's proposed testimony. "We review challenges to a district court's evidentiary rulings for abuse of discretion." United States v. Buffalo, 358 F.3d 519, 521 (8th Cir. 2004).[4]

As recounted above, Wood's testimony was offered by the government to impeach Hall's testimony by showing that Hall had made prior statements to Wood that were inconsistent with his in-court testimony. Rules 607 and 613(b) of the Federal Rules of Evidence, when read together, allow a party to impeach its own witness with extrinsic evidence of prior inconsistent statements. See id. at 522; FED. R. EVID. 607, 613(b). Before such evidence is allowed, however, it must meet certain requirements. First, under Rule 613(b), the inconsistent statement must not concern a collateral matter and the witness must be confronted with the statement and afforded an opportunity to explain or deny it. Buffalo, 358 F.3d at 524. Second, the court must conduct a Rule 403 balancing test to determine whether the statement's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Id. at 524-25 (citing FED. R. EVID.

---

[4]The government alleges that the defendants did not properly preserve their evidentiary issues for appeal, thereby warranting only plain error review. See United States v. Jones, 266 F.3d 804, 814 (8th Cir. 2001). After examining the record, we conclude that the defendants' objections were sufficient to preserve their arguments on appeal, and we therefore review for abuse of discretion. See United States v. Ball, 868 F.2d 984, 987 (8th Cir. 1989).

403). If the probative value of the evidence is found to outweigh its potential prejudice, the statement is admissible. This latter requirement serves to prevent a party from "call[ing] a witness, knowing him or her to be adverse, merely to make an end-run around the rule against hearsay by impeaching the witness with a prior inconsistent statement that the jury would not otherwise have been allowed to hear." Id. at 522-23.

We conclude that Hall's prior inconsistent statements, as offered through Wood's testimony, satisfy the foundational requirements of Rule 613(b). They involved matters that were material to the charges brought against the defendants, and Hall was squarely confronted with the statements during his direct examination. Our next consideration, therefore, is whether Wood's testimony was admissible under Rule 403, which is a closer question.

The defendants argue that Wood's testimony was highly prejudicial and had little probative value and thus should have been excluded under Rule 403. Wood's testimony did indeed carry a risk of prejudice to the defendants, recounting as it did a number of statements made by Hall that directly implicated both of the defendants in the crimes with which they were charged and which would otherwise not have been admitted into evidence. The defendants contend that Wood's testimony lacked probative value as impeachment evidence because Hall had merely denied making certain statements to Wood and did not affirmatively damage the prosecution's case during his direct testimony. Hall's testimony during cross-examination was not so innocuous, however, as it suggested that the police had made up the incriminating statements and attributed them to Hall in order to get a conviction. Moreover, his statements that he had never seen the defendants cook, sell, or buy methamphetamine essentially made him a witness for the defense. Thus, Wood's testimony was of probative value to the government, as it impeached Hall's damaging testimony.

Wood's testimony was thus both prejudicial to the defendants and probative to the prosecution. We do not minimize the dangers involved when a party attempts to

impeach its own witness, and the use of this type of testimony is not to be encouraged. Nevertheless, we cannot say the district court abused its discretion by allowing Wood to testify. The fact that Hall's testimony affirmatively damaged the prosecution's case gave Wood's testimony probative value greater than that found in other cases. See, e.g., United States v. Logan, 121 F.3d 1172, 1175-76 (8th Cir. 1997); United States v. Ince, 21 F.3d 576, 581 (4th Cir. 1994). Moreover, the potential prejudicial impact of Wood's testimony was lessened by the fact that the limiting instruction was given prior to his testimony. Cf. Logan, 121 F.3d at 1176 (suggesting that a limiting instruction is more effective when given prior to the testimony being entered). Furthermore, Wood did not testify to or suggest that the defendants had admitted or confessed to the crimes with which they were charged, and thus the risk of the heightened prejudicial impact that such testimony carries was not present in this case. Cf. Buffalo, 358 F.3d 519, 525 (quoting Ince, 21 F.3d at 581). In sum, then, we conclude that the court did not abuse its discretion when it found that the probative value of Wood's testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

Likewise, we conclude that the district court did not abuse its discretion when it refused to permit Homes to testify, for nothing in her proposed testimony would have contradicted Williamson's testimony, nor would it have corroborated the defendants' theory that Williamson had been manufacturing methamphetamine while living with Homes.

B.

We next address whether the district court erred when it denied the defendants' motion to suppress. We review a district court's factual determinations supporting a denial of a motion to suppress for clear error and its conclusions of law *de novo*. United States v. Velazquez-Rivera, 366 F.3d 661, 664 (8th Cir. 2004).

The defendants contend that the evidence seized pursuant to the search warrant should have been suppressed because the affidavit was insufficient to establish probable cause and omitted information the inclusion of which would have rendered it defective. "Probable cause exists when a practical, common-sense evaluation of the facts and circumstances shows a fair probability that contraband or other evidence will be found in the asserted location," United States v. Adams, 110 F.3d 31, 33 (8th Cir. 1997). An issuing judge's probable cause determination is entitled to substantial deference. United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996). The affidavit for the search warrant provided, *inter alia*, that 1) the defendants and Mason had been living with Williamson for the past five weeks, 2) officers had been called to the Lee's Summit Hospital on December 12, 2003, to investigate the death of an infant, Mason Durham, whom the defendants had brought to the hospital after discovering he was not breathing, 3) the defendants accepted a ride to the hospital from Williamson rather than call 911, 4) the defendants stated that they did not know their address when questioned by the police at the hospital, 5) approximately a month before Mason's death, the police department had received two anonymous phone calls reporting a methamphetamine lab at Williamson's residence and concern for the health of an infant present at the residence, and 6) Mason had tested positive for methamphetamine at the time of his birth.

The defendants argue that this affidavit was insufficient on its face to establish probable cause. We disagree. An informant's tip can be relied on to support a probable cause determination if the informant has provided reliable information in the past or if the tip is independently corroborated. United States v. Caswell, 436 F.3d

894, 898 (8th Cir. 2006). Here, the tips appeared to be sufficiently corroborated by the fact of Mason's death, as well as by his positive test for methamphetamine, and they certainly raised suspicions as to whether Mason's death was caused from an exposure to methamphetamine.[5] Further, the fact that the defendants could not tell the police their address and that Williamson drove them to the hospital instead of calling 911 could give rise to a reasonable inference that Durham, Duncan, and Williamson wanted to keep authorities away from the home and contributes to the suspicion surrounding Mason's death. In light of this information, we conclude that the affidavit supported a finding that probable cause existed to believe that the young child may have died from exposure to methamphetamine or that there would be evidence of a methamphetamine lab found at the defendants' residence.

The defendants further argue that information was omitted from the affidavit which, if included, would have caused the judge not to issue the warrant. They assert that the affidavit should have stated that the child's body showed no signs of child abuse, that the identity of the tipsters was known, and that the officers questioned the tipsters' reliability. To prevail on this argument, the defendants must "prove first that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading, and, second, that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002). The omitted information pointed to by the defendants does not support such a conclusion, irrespective of whether it was excluded intentionally or recklessly. The fact that Mason showed no signs of physical abuse would not have undermined the possibility that his death could have been caused by an exposure to methamphetamine or the production of methamphetamine. As for the informants, at the time the affidavit was submitted the officers knew only that the two callers had more than a casual relationship. The informants' identities

---

[5]It is important to note that at the time the affidavit was submitted and search warrant issued, the officers did not know the cause of Mason's death and had not yet received the autopsy report stating that it was a SIDS death.

and supposed unreliability were mere speculations on the part of the officers based on their assumption that the first informant was Williamson's vindictive ex-girlfriend, speculations that occurred before the officers had learned of Mason's death and the circumstances surrounding it. These speculations, if included in the affidavit, would not have undermined a finding of probable cause. Accordingly, the district court did not err in denying the motion to suppress.

## C.

The defendants contend that the district court erred in determining that they should receive a six-level enhancement to their base level offense under U.S.S.G. § 2D1.1(b)(6)(C) for creating a substantial risk of harm to a minor. We review a district court's interpretation and application of the sentencing guidelines *de novo* and its findings of fact for clear error. United States v. Mashek, 406 F.3d 1012, 1017 (8th Cir. 2005).

In imposing the enhancement, the district court pointed to evidence showing that methamphetamine was manufactured in Mason's room, that Mason had been directly exposed to drug activity, and that chemicals found in the garage had been moved there from Mason's room. In light of these facts, the district court did not err in imposing the enhancement.

Duncan argues that she should have received a base level reduction under U.S.S.G. § 3B1.2 for having a minor role in the offense because her only involvement was to strip match books for use in the methamphetamine manufacturing process. Application Note 3(A) of § 3B1.2 provides that a base level reduction is appropriate for a person who is "substantially less culpable than the average participant." We conclude that the district court did not err when it declined to grant the requested reduction. Duncan took an active role in the manufacturing process and performed one of the necessary steps in the process. As a result, she was not substantially less culpable than the average participant and thus was not entitled to a reduction.

-10-

## Conclusion

The judgments are affirmed.

_____